JOHN STEYER vs. JOHN HOYE, H. M. PETTIT AND JAMES
SMITH.—December, 1841.

On the 28th December, 1835, S. obtained a warrant of resurvey, which he
executed and closed at the county surveyor's office on the 10th June, 1836.
On the 1st November following, he caused a new survey to be made, taking
in a much larger amount of vacancy than on his first survey. The second
survey was returned into the land office on the 17th November, 1836, and
caveated on the 5th December, 1836, and 12th August, 1837. J. under a
common warrant returned a certificate of survey into the land office on the
13th August, 1836, then paid his composition money, and on the 3rd
March, 1837, his certificate not being caveated, procured a patent. The
patent of J. extended across the land taken up by S., so as to destroy the
contiguity between the original tract of S. and its adjacent vacancy, and
the vacancy which S. claimed to include under his second survey. The
vacancy thus cut off, was claimed by H. under a certificate returned to the
land office on the 2nd September, 1836, compounded on the same day, ca-
veated by S. in November, 1836, and patented upon the overruling of that
caveat in November 1837. Upon a bill filed by S. to vacate the patents
to J. and H. upon the ground of combination and fraud, to intercept the
due prosecution of his warrant, by the wrongful interposition of J's. patent,
for the purpose of destroying the continuity of the vacancy. It was held
there was no proof of fraud; that if S. had not neglected for six months to
enter his caveat to J's. patent, the judge of the land office would have re-
jected his certificate, and thus the equitable right of priority in S. would
have remained unimpaired.

A warrant of resurvey gives the holder thereof a prior right according to its
seniority, to acquire a title to all the vacancy contiguous to his tract of land ;
but at the same time the law exacts due diligence according to the rules of
the land office, from such holder, to perfect his equitable title in due season,
or protect himself from the operation of other surveys which may conflict
with his rights, and which he did not (as he might have done,) caveat.

No land can be taken up under a warrant of resurvey as vacancy, but that
which lies adjacent to the tract resurveyed. It may extend to the lines of
other tracts, but not beyond or over them.

Where a tract of vacant and unpatented land may be affected by one of two
outstanding warrants, the fact that the one, which has not the prior right,
did execute his survey, and proceed to procure a patent in the absence of
a caveat before the other, is not a circumstance from which a court of
equity will infer fraud.

It is a general and well established rule of the land office, that no patent
shall be issued for any land for which a patent has been previously granted,
yet it often happens from inattention or accident, that this rule is not ob-
served, and therefore it has been laid down from a very early period, that
a patent always gives title by relation from the date of the certificate, spe-
cial warrant, or entry in the surveyor's book, on which the land has been
particularly designated and described. Per BLAND, J. L. O.

For this purpose a warrant of re-survey is considered as a special warrant, binding from its date, so that by this legal relation to the date of the certificate or special designation, the evils which may arise from there being apparently two legal titles, derived from the same grantor, for the same land, may be in a great measure easily corrected. Per BLAND, J. L. O.

Where there are remaining in the land office two certificates, held by different persons, for the same land, upon which *no* patent has been issued, the holder of the *elder* certificate may by *caveat* prevent a patent from issuing on the *younger* one; but if he does not do so, and a *patent* is obtained on the *junior* certificate, a patent will not upon a *caveat* be granted upon such elder certificate. Per BLAND, J. L. O.

All proceedings in the land office being public, and open to all persons, it may fairly be presumed, that the holder of the *elder* certificate, knew of and waived all objection to the issuing of a patent upon the *junior* certificate. Per BLAND, J. L. O.

A patent obtained upon a junior as against an elder certificate, or special warrant, by reason of the negligence of the holder of such elder certificate or special warrant in not attending to his prior rights, or not filing a *caveat*, is valid; and may destroy the continuity of an adjacent vacancy, for which otherwise the holder of the elder certificate might have procured a patent. *Ibid.*

A caveat may be entered at any time before, but not after a patent has been actually signed by the Governor and Chancellor, and the great seal affixed thereto. *Ibid.*

APPEAL from the Court of Chancery.

On the 31st August, 1838, *John Steyer* filed his bill alleging, that being seized of a tract of land called *"the Plains of Moab,"* contiguous to which it was supposed there was to be found much vacant land, he did on or about the 28th day of December, 1835, sue out of the land office a warrant to resurvey his aforesaid tract of land called *"the Plains of Moab,"* with liberty to include contiguous vacant lands; that said warrant was shortly afterwards placed in the hands of the surveyor for execution; and on or about the 1st of November, 1836, was executed, and a certificate of the resurvey made on account of complainant, was returned into the land office; whereby it appears that your orator's original tract contained the quantity of 3773⅔ acres, clear of elder surveys; and that the surveyor had included the quantity of 3369¼ acres of vacant land; and that the whole was reduced into one tract by the name of *Competition,* as by reference to said certificate now remaining

in the land office, will appear; that he duly compounded on his aforesaid certificate of resurvey, and thereby entitled himself to demand a patent therefor, and but for the acts and doings of the defendants hereinafter named, would have obtained such patent in due season.    But now, so it is, that *John Hoye, Henry M. Pettit* and *James Smith,* confederating together to defraud complainant of the benefit of his aforesaid warrant of resurvey, and to appropriate the vacancy to themselves, the said *John Hoye* caused a common warrant, which he had previously sued out of the said land office, to be laid on or before the 22nd April, 1836, on a part of the vacancy, so as aforesaid affected and bound by the complainant's warrant of resurvey, and returned into the land office a certificate of his survey by the name of "*Coal;*" and afterwards having assigned a moiety of his interest in said certificate to the said *Pettit,* the said partners on or about the 2nd May, 1836, sued out a warrant to resurvey said tract, with the power of taking up the contiguous vacancy, which said warrant was executed on the 10th June, 1836, and a certificate of the resurvey thereof was shortly afterwards returned into the said land office by the name of "*Coal and Iron Certain;*" whereby it appears, that under cover of their aforesaid warrants, the said *Hoye* and *Pettit* had taken up and appropriated the quantity of 2756½ acres, parcel of the vacancy, which was designed to be affected, and in truth was bound by the complainant's warrant of resurvey.    The complainants thereupon entered *caveats* against the issuing of patents on the aforesaid certificates of the said *Hoye* and *Pettit,* and they entered a *cross caveat* against your complainant's aforesaid certificate for "*Competition,*" and depositions were taken by the parties aforesaid, and returned into the said land office, to be used at the hearing of the aforesaid *cross caveats.*

The complainant was then for the first time made aware of the fact, that the said confederates, the better to advance their aforesaid wrongful purposes, had procured a common warrant of resurvey to be issued out of the said land office in the name of the said *James H. Smith,* under color of which the said *Smith*

had taken up another body of vacant land, which was as afore-said covered by your orator's warrant of resurvey, and had caused a certificate of survey thereof to be returned to the said land office by the name of "*Birmingham Mines,*" and procured a patent to be issued therefor to him, and having thus secured a legal title to the said land, a *caveat* was entered in the name of said *Smith* against the said *Steyer's* certificate of resurvey.

That at the hearing of the aforesaid *caveats,* which were heard together, the complainant's counsel insisted, that he had made out out a clear, legal, and equitable title, to all the aforesaid vacancy against the aforesaid confederates; but the Chancellor (as judge of the land office,) was of opinion, that inasmuch as the said *Smith* had procured a patent for the said tract called "*Birmingham Mines,*" it would be necessary to have that tract vacated before a second patent could be granted to complainant for the same land; and therefore the caveat of the said *Smith* against *Steyer's* certificate was ruled good. And the judge of the land office was further of opinion, that the continuity or connexion between the vacancy included in the aforesaid cer-tificates of the said *Hoye* and *Pettit,* and your orator's original tract called "*the Plains of Moab,*" having been destroyed by the intervening survey of the said *Smith* of "*Birmingham Mines,*" the complainant could make no title to the said vacancy under his aforesaid warrant of resurvey; and there-fore the complainant's "*caveats*" against the said *Hoye* and *Pettit* were overruled; and the *caveat* of the said *Hoye* and *Pettit* against complainant's certificate was held good, and a patent was directed to be issued to them for the vacancy, so as aforesaid included in their surveys, all which will appear, &c.

The bill then alleged that complainant was advised that said judgments were not conclusive against his claim to equitable interposition of this court, against the technical rights which have been acquired by the aforesaid confederates; and that he will be entitled to a decree vacating all the patents granted to the parties aforesaid, or declaring that said parties shall stand seized of the premises so granted to them as trustees for the

complainant, and requiring them to convey the same unto him upon proving the fraud and confederacy aforesaid; and even in the absence of any proof of actual fraud on the part of the said parties, that Chancery will impute to them an improper and fraudulent motive, from the fact that they were aware of the existence of your orator's warrant of resurvey, and of its legal operation, in giving a priority of right or pre-emption to your orator to all the aforesaid vacancy, at the very time they were seeking by the practices aforesaid, to appropriate the same vacancy to their own use. And complainant suggests that his resurvey was in fact made before the granting of the aforesaid patent to the said *Smith;* his resurvey was made at a time when it was perfectly competent to him, according to the usages of the land office, to include therein all the vacancy which he has included, and if according to the strict rules of the office, his resurvey once rightly made, could be avoided by the subsequent grant of a portion of the land so taken up by him, to the said *Smith,* he is advised that the effort to avail themselves of this unjust operation of the rule, was a breach of equity and conscience on the part of the said *Hoye* and *Pettit,* which ought to subject them to the pointed rebuke of this honorable court. And the complainant charges, that he was entirely ignorant of the existence of the aforesaid survey of the said *Smith,* until after a patent had been granted to him as aforesaid; and by the practice of the aforesaid parties was led to believe, that the certificates aforesaid of the said *Hoye* and *Pettit* were alone relied on to defeat his rights; and he further avers, that the grant of the patent to the said *Smith* as aforesaid, operated as a surprise on him, and that all the measures of the aforesaid parties, and every of them, were had with full notice of the existence of your orator's warrant of resurvey, and of its legal operation, and of the intent of your orator to avail himself thereof, and for the purpose of defeating its operation, and securing the aforesaid vacant land to themselves. Prayer for general relief according to his case.

The several answer of *John Hoye* alleged, that in April, 1836, he, this defendant, made a survey of a tract of land

called "*Coal*," situated, &c. ; that his survey was duly and legally made, and that he assigned the one undivided half or moiety of the same to *Henry M. Petit*, the aforenamed, who paid him a valuable consideration for the same ; and that the office certificate of the same was some time in the month of April, 1836, returned into the land office, and the composition money due to the State for the vacant land so taken up was regularly and duly paid into the treasury; that a warrant of resurvey was sued out of the land office by this defendant, and the said *Pettit*, to resurvey said tract of land, add vacancy, &c., and that in the month of May, 1836, this defendant and the said *Pettit* instructed the surveyor of *Allegany* county to execute the same; that after the said surveyor had made some progress in the execution thereof, he, the said surveyor, informed this defendant and the said *Pettit*, that the said *John Steyer* was at that time the holder of a warrant of resurvey; that either might or did extend to and affect the vacant land intended to be taken up by this defendant and the said *Pettit*, under their aforesaid warrant of resurvey ; that this defendant for himself and in behalf of the said *Pettit*, then instructed the said surveyor to do nothing more towards the execution of their said warrant of resurvey until the said *Steyer* should have executed his aforesaid warrant, and should have taken what vacant land he might desire to take up under the same ; that the said surveyor did so suspend the execution of the aforesaid warrant of this defendant's and the said *Pettit's ;* that on or about the 10th day of June, 1836, the said *Steyer* did execute his said warrant of resurvey, as appears by the record of the certificate of said resurvey, called "*the Plains of Moab*," resurveyed on the books and records of the surveyor of *Allegany* county, to a copy of which certificate marked A, herewith exhibited, this defendant asks leave to refer as a part of this answer. This defendant further answering saith, that when he instructed the said surveyor to suspend the execution of his and the said *Pettit's* warrant of resurvey as aforesaid, he at the same time requested the said surveyor to proceed as soon as he could after said *Steyer* should have executed his aforesaid warrant, and to

take up for this defendant and the said *Pettit*, all the vacant land left unoccupied and not taken up by the said *Steyer;* that in making this request he wished to practice no unfairness towards the said *Steyer*, but this defendant did so in the prosecution of his own rights; that the said *Steyer's* warrant had lain unexecuted from 28th December, 1835, until the summer of 1836, during all which time the said *Steyer* had full opportunity and leisure to make his mind about the location and quantity of the land he might wish to take up; that this defendant expressly told the said surveyor to defer the execution of the warrant belonging to this defendant and the said *Pettit*, until the said *Steyer* should take whatever quantity of vacant land he might choose to take, and then to take up for this defendant and the said *Pettit*, the remaining vacancy, whatever the quantity might be.

That this defendant is advised, that the records as aforesaid of the certificate of the resurvey of the said *John Steyer*, made on the 10th June, 1836, as aforesaid, was full notice to the whole world of the execution of his warrant dated on the 28th day of December, 1835, and of the quantity and location of the land he had elected to take under that warrant. That in pursuance of the instructions given to him by this defendant, the said surveyor, shortly after the said *Steyer* had executed his warrant, proceeded to complete the execution of the warrant of resurvey of this defendant's and the said *Pettit's;* that in conformity with the practice of the said surveyor, the said resurvey is dated on the day of its commencement, which was the 17th May, 1836; that the said resurvey or tract of land was called "*Coal and Iron Certain;*" that it contains the quantitity of 2,756½ acres of land, and that the composition money on the vacant land therein included, was duly paid into the Treasury of the State by this defendant and the said *Pettit*, a short time after the said resurvey was completed, the office certificate of said resurvey having been duly returned into the land office by them. And this defendant further answereth and saith, that no other person whatever except the said *Pettit*, ever had or now has any share, part or interest, with this de-

fendant in the said tract of land called "*Coal and Iron Certain*," and that the said *Smith* never had any interest direct or indirect in the same, and that this defendant never told him any thing about the taking up of said land, when this defendant was about to take up the same in connexion with the said *Pettit;* and further, that this defendant never had, nor has he now, any part, share or interest in the tract of land called "*The Birmingham Mines*," taken up by the said *Smith* in the summer of the year 1836; that when the tract called "*Coal and Iron Certain*" was taken up for this defendant and the said *Pettit*, this defendant instructed the surveyor of *Allegany* county, to include in said tract all the land left vacant by the said *Steyer*, at the time of his executing his aforesaid warrant, and that this defendant thought the said surveyor had so included all said vacant land in said tract of land called "*Coal and Iron Certain*," and that this defendant did not then know that the intervening vacancy between the land taken by said *Steyer*, on the 10th day of June, 1836, and the tract called "*Coal and Iron Certain*," did exist at all, and that this defendant and the said *Pettit*, and neither of them, left said piece of land so intervening remaining vacant for the purpose of permitting or enabling the said *Smith* to take up the same, and that the said piece of land was not left vacant by this defendant, or by this defendant and the said *Pettit*, in order that the said *Smith* might take up and intercept or cut off the connection between the tract of land called "*The Plains of Moab Re-surveyed*," and the said tract called "*Coal and Iron Certain*," or in any manner to injure the said *Steyer*, or prejudice him in the enjoyment of any of his rights under any warrant of his, or in any manner to benefit, favor or befriend the said *Smith*, or any other person in relation to said intervening and remaining piece of vacant land. And further, that this defendant and the said *Petit* had nothing to do with the suing out of a warrant out of the land office in the name of the said *James Smith* or *James H. Smith*, or any other person, for the purpose of taking up said piece of vacant land, nor had this defendant, or this defendant and the said *Pettit*, any thing to do with the

27        v.12

warrant purchased by said *Smith* for that purpose. And this defendant further answereth and saith, that the tract of land called "*Coal and Iron Certain*" was not taken up, or the certificate of resurvey thereof, dated on the 10th day of June, 1836, but on the 17th day of May, 1836, and that the certificate of the resurvey made by the said *Steyer* under his aforesaid warrant, bears date properly on the 10th day of June, 1836, and not on the 1st day of November, 1836, and that the original tract of land on which said *Steyer's* warrant was sued out did not contain the quantity of 3,773⅝ acres, but the quantity of 456⅝ acres, and that the resurvey made under his said warrant did not contain the quantity of 3,369¼ acres of vacant land, but only the quantity of 121¼ acres of vacancy, as appears by the certificate of resurvey bearing date on the 10th day of June, 1836, and placed on the records of the surveyor of *Allegany* county as aforesaid, a copy of which certificate is herewith exhibited and referred to, marked A. And further, that the alleged resurvey called "*Competition*," was not fairly made, nor at a time when it was competent and proper for the said *John Steyer* to make the same, inasmuch as that resurvey was professedly made on the 1st day of November, 1836, when in truth the warrant of resurvey under which it was professedly made, had been already executed on the 10th day of June, 1836, as aforesaid; that by the certificate of said resurvey placed on record in the surveyor's office as aforesaid, the said *Steyer* gave notice to this defendant and the whole world, of the execution of his, the said *Steyer's* warrant, on the 10th day of June, 1836, and of the quantity and boundaries of the land he had chosen to take up under his said warrant, and that it was perfectly competent and right for this defendant and the said *Pettit*, to take up the vacant land left by the said *Steyer* at the aforesaid execution of his warrants, at the time when they did take it up, as this defendant is advised; that it was not competent and right for the said *Steyer* to reform his said warrant and execute it a second time, even for his own use and benefit, to the prejudice of the rights of this defendant and the said *Pettit*, in the premises, much less could the warrant of the said

*Steyer* be executed a second time for the benefit of a third party, as this defendant is advised. And this defendant further answering and saith, that he is credibly informed and verily believes, that the said warrant of the said *Steyer* was executed on the said 1st day of November, 1836, not for the use and benefit of the said *John Steyer* himself, but for the use of a certain *Joseph Dilly* and a certain *George McCulloh*, who, wishing to deprive this defendant and the said *Pettit* of the land included in said tract called "*Coal and Iron Certain*," purchased from the said *John Steyer*, the privilege of executing his aforesaid warrant a second time, after it had been already executed on the 10th day of June, 1836 ; that this defendant is informed and verily believes, the honesty and propriety of the said second execution of said *Steyer's* warrant was a matter of doubt even with some of the parties interested in the scheme; that the said *Dilly* and *McCulloh*, well knowing that they could not at the time spoken of, nor at any time afterwards, acquire title to the land already taken up by this defendant and the said *Pettit*, and included in said tract called "*Coal and Iron Certain*," under any new warrant to be by them sued out of the land office, after taking legal advice as to the propriety of the measure entered in the name of the said *Dilly*, with much caution, into a contract with the said *John Steyer* in writing, according to which contract the said *Dilly* was authorised to use the name of the said *John Steyer*, in the execution of his said warrant of resurvey, which had been already executed on the 10th day of June, 1836, and as soon as a patent should issue to said *Steyer*, for the land to be taken up under the second execution of said warrant, then the said *Steyer* was bound to convey to the said *Dilly*, the land so patented to the said *Steyer;* that the consideration according to said contract to be paid, and it is believed was paid to the said *Steyer* by the said *Dilly*, was a small sum of money; that certain blanks to be filled according to said written contract, with a reference to a certain plat said to be in the hands of the county surveyor, were left in the written contract itself, but it has never been made to appear that there was at that time any

plat belonging to the parties in the hands of the said surveyor, except the usual plat belonging to the certificate of resurvey, dated on the 10th day of June, 1836, as aforesaid; that however the said instrument of writing executed as a contract between said *Steyer* and *Dilly*, might have been intended by *Dilly* to affect the mind of *Steyer* in relation to vacant land then still to be taken up, it was not considered safe to rely on said contract at the hearing of the cases of *caveat* between the said *Steyer* and this defendant and the said *Pettit;* and to give a better coloring to the proceedings of the said *Dilly* and *McCulloh*, a second contract in writing was executed between *Steyer* and *Dilly*, it is believed by this defendant sometime in the month of April 1837, according to which latter contract, the additional vacancy taken up by *Dilly* at the second execution of said *Steyer's* warrant, was specifically parcelled out between the said *Steyer* and the said *Dilly*, to which said written contracts this defendant would refer for greater certainty, as remaining in the papers in the *caveat* cases above mentioned, adjudged by his honor the Chancellor, in the month of November, 1837.     And this defendant further answering, that he is advised the laws of *Maryland*, and the usages of the land office, will not recognize or sanction such a use of a warrant of resurvey as that attempted by the said *Dilly*, or *Dilly* and *McCulloh*, hereinbefore stated ; that the said laws and usages require the holder of the warrant to be seized of an estate in fee simple, in the tract of land on which the warrant of resurvey is sued out; that a warrant of resurvey possesses no assignable qualities; that the said *Dilly* was not, nor were the said *Dilly* and *McCulloh*, seized of any kind of an estate in the tract of land on which the said *John Steyer* had sued out his said warrant of resurvey; that the said *Dilly* or *Dilly* and *McCulloh*, could not do indirectly what they could not to directly, in the premises; that if the said *Dilly* had wished to act fairly and uprightly in the business, he would have applied to the land office for a warrant to take up said vacant land in the usual manner, and that he would not have veiled his designs behind said *Steyer's* warrant, by attempting

to execute it a second time. This defendant further answereth and saith, that he is credibly informed and verily believes, that a part of the design of the said *Dilly* and *McCulloh* in their aforesaid scheme was, that they might under color of said *Steyer's* warrant, be enabled with a better grace to use the field notes and plats used by this defendant and the said *Pettit*, when this defendant and the said *Pettit* took up said tract of land called "*Coal and Iron Certain;*" and that it appears from the testimony of the surveyor of the county in the aforesaid *caveat* cases, that the said *Dilly* instructed the said surveyor to use the said field notes and plats at the second execution of said *Steyer's* warrant, and when the said tract called "*Competition*" was ostensibly taken up, and that in fact all the surveyor was required to do under the instructions of said *Dilly* in this case was, to extend the said *Steyer's* first resurvey made on the 10th day of June, 1836, by platting on the tract of land then taken up by this defendant and the said *Pettit*, and called *Coal and Iron Certain.* And this defendant further answereth and saith, that he is advised the attempt of the said *Dilly* and *McCulloh* to use the warrant of the said *Steyer*, by executing it a second time for their own benefit, and their further attempt to avail themselves of the labor, expense and information of this defendant and the said *Pettit*, in taking up said tract of land called *Coal and Iron Certain*, and applying said labor, expense and information to their own account, in making said survey called *Competition*, was a fraud committed by them against this defendant and the said *Pettit*, and that this allegation of fraud is fully justified and sustained by reference to the said surveyor's testimony in the *caveat* cases aforesaid, whereby it appears that the said surveyor could not have executed said *Steyer's* warrant a second time in the manner he did, without using the field work and plats aforesaid, belonging to this defendant and the said *Pettit*. This defendant further answereth and saith, that he is advised the use made of the said *John Steyer's* name throughout the whole of the present controversy, is altogether unlawful and unjustifiable; that in fact, looking no further than the first con-

tract made in writing between *Dilly* and *John Steyer*, the said *Steyer* is throughout the controversy in every stage of it, nothing more than a nominal complainant; that from the testimony taken in the *caveat* cases aforesaid, it fully appears that the said *Dilly*, in company with a lawyer, went to said *Steyer* and got him to enter into the aforesaid contract, and that by that contract the said *Dilly* binds himself to pay all the costs that may arise in the controversy, then cautiously commenced by *Dilly*, or *Dilly* and *McCulloh*, about the lands sought to be taken from this defendant and said *Petit*, by the aforesaid device of using said *Steyer's* warrant; that from the said testimony it further appears, that even in the commencement of the dispute the said *Steyer* was passive, and in the commencement and throughout the controversy, this defendant is informed and verily believes, that the said *Dilly* and *McCulloh* were the agitators of strife and the projectors of law-suits for their own benefit, and to answer their own sinister purposes; to all of which testimony taken in said cases of *caveat*, this defendant begs leave to refer as a part of this his answer, to said bill of complaint.

This defendant further answereth and saith, that he had no notice of any warrant of the said *Steyer's* at the time when this defendant and said *Pettit* made said resurvey called "*Coal and Iron Certain*," except the notice which this defendant had of the warrant of said *Steyer*, executed on the 10th June, 1836, as aforesaid; and that from the records of the surveyor's office of *Allegany* county, it appears that said warrant was executed on the 10th day of June, 1836, as aforesaid, which record was notice to the world of the execution of said warrant, and of the quantity and location of the land taken up under it by the said complainant.

This defendant further answereth and saith, that the aforesaid resurvey called "*Coal and Iron Certain*," was fairly and properly made by this defendant and the said *Pettit;* and that this defendant never did in any manner practice, or attempt to practice, any surprise on the said complainant or those using his name, preparatory to or at the hearing of the aforesaid

cases of *caveat*. And this defendant further answereth and saith, that he is advised there is no just cause why the decree passed by his honor the Chancellor at the hearing of the aforesaid cases of *caveat* ought to be reversed, or the patent granted to this defendant and the said *Petit*, for the said tract of land called "*Coal and Iron Certain*," vacated. This defendant denies all and all manner of unlawful combination, confederacy and fraud, wherewith he is by the said complainant's said bill of complaint charged, and humbly prays to be hence dismissed, &c.

With this answer was filed exhibit A:

*State of Maryland, Sct:* By virtue of a special warrant of resurvey, granted out of the Land Office for the Western Shore, to *John Steyer* of *Allegany* county, bearing date the 28th day of December, 1835, to resurvey the following lands lying and being in *Allegany* county aforesaid, viz: *The Plains of Moab,* originally on the     day of     granted     for     acres     and     part of *Sideling Hill*, originally on the     day of     granted     for     acres. To amend any errors in the original surveys, add any vacant land thereto contiguous, and to reduce the whole into one entire tract, &c. I certify as Surveyor of *Allegany* county, that I have carefully resurveyed, for and in the name of him the said *John Steyer,* the tract of land called *The Plains of Moab,* and find it to contain 456⅜ acres, to which I have added two pieces of contiguous vacancy, containing 121¼ acres, and have reduced the whole into one entire tract. And lastly, beginning for the outlines of the whole at the beginning of *The Plains of Moab,* the present original, it being also the beginning of *Sideland Hill,* a former original, and running thence with the lines of *The Plains of Moab,* the present original, &c.

To the end of the 24th and last line of the original, then by a straight line to the beginning, containing 577⅝ acres. To be held by *The Plains of Moab Resurveyed.* Resurveyed the 10th day of June, 1836.          Benjamin Brown,
                                          *Surveyor of Allegany County.*

The original contains 456⅜ acres.

The first vacancy contains 62¼.

The second vacancy contains 59.

The two vacancies contain 121¼.

The resurvey contains 577⅘.

Annexed to the certificate was the surveyor's plat.

The several answer of *H. M. Pettit* was similar to that of *J. Hoye.*

The several answer of *James Smith* saith, that in the month of May, 1836, this defendant was one day present when some reference lines were run under the direction of the said *John Hoye,* along the base and south-eastern slope of *Savage Mountain ;* that this defendant was so present, not because he had any interest in the surveying done on said day, but because on the day following, some lines were to be run and were run, in which this defendant was interested, which said lines so run on said second day, were run in the neighborhood of a tract of land called *Commonwealth;* that this defendant did not at that time know the object of said *Hoye* in running said lines on said first day, further than that he supposed the said *Hoye* was doing so with a view of taking up vacant land; but no questions were asked and no explanations given on the subject; that this defendant had not then, nor has he now, nor has he at any time since, had any interest, share or part, direct or indirect, in the aforesaid surveying or running of lines, done on the said first day under the direction of the said *Hoye ;* that he has since learned that said lines run on said first day by said *Hoye,* had relation to the tract of land called *Coal and Iron Certain,* taken up by said *Hoye* and *Pettit,* and that this defendant has not now, and never has had, any share, part, right or interest in said tract of land with the said *Hoye* and *Pettit,* or any other person. This defendant further answereth and saith, that in the summer of the year 1836, he understood from various sources that a controversy had arisen between the said *Hoye* and *Pettit* on the one side, and the said complainant or a certain *Joseph Dilly,* on the other side, respecting some land which the said *Hoye* and *Pettit* had taken up, as

this defendant understood; that the said complainant had executed a warrant, as this defendant was told, and had taken up some vacancy under his said warrant, and that the said *Hoye* and *Pettit* had taken up some vacancy contiguous to the said vacant land so as aforesaid taken up by the said complainant under his warrant, and that the said *Dilly* wished to have the said complainant's said warrant executed a second time, so as to include, as this defendant understood, the land already taken up by said *Hoye* and *Pettit*, and that the said *Dilly*, claiming under the said complainant's warrant so executed a second time, wished to secure to himself the title to the said land already taken up as aforesaid by the said *Hoye* and *Pettit ;* that such was the opinion this defendant had formed about said controversy, that this defendant here distinctly adds, that the impression made on his mind at that time, concerning the pretensions of the said complainant or *Dilly* on the one side, and the said *Hoye* and *Pettit* on the other side was, that the piece of vacancy taken up in the first instance by the said *Steyer*, and that taken up by the *Hoye* and *Pettit*, either met at a point or were united by a broader tie; that this defendant understood the said parties to be at issue, as to the right of the said *Steyer* to execute his aforesaid warrant a second time for the use of the said *Dilly*, or rather, as to the right of the said *Dilly* to execute said warrant a second time in the name of the said *Steyer*, but in fact for the benefit of the said *Dilly* himself, to the prejudice of the rights of the said *Hoye* and *Pettit* in the premises; that the field of controversy, as this defendant understood, was limited by the lines of said *Hoye* and *Pettit's* survey, which this defendant has since learned was or is called *Coal and Iron Certain;* that in making their said surveys, each of the parties had made a selection of the quantity and location of the land by them respectively desired to be taken up; that for several years last past, this defendant has been in the practice of purchasing from the State, any vacant lands he could discover that were in his opinion worth the labor and expense of being surveyed and compounded on; that in the summer of the year 1836, this defendant took

up the opinion that there possibly was vacant land lying in the neighbourhood of the disputed lands above mentioned, but this defendant had a very imperfect knowledge of that district of country, having never passed through it except in the month of May 1836, when he was one day occasionally with the surveying party already mentioned, as running reference lines under the direction of the said *Hoye;* that this defendant's mind became impressed with the belief that there was some vacant land between a tract called *Stony Ridge* and *the Bat,* on the one side of a tract called *Addition to Policy,* and some *Soldiers Lots* on the other side ; that this defendant had a conversation with surveyor of *Allegany* county concerning said supposed vacancy, and requested him to make some examinations on the subject; that the said surveyor informed this defendant there was vacant land at the place above designated, that the part of said vacancy towards the north was broad, and that there was another broad piece of vacancy considerably further to the south, and that it was doubtful whether there was any connecting piece of vacancy extending from said broad piece in the north to said broad piece in the south, but on further examination the said surveyor told this defendant there was such a connection ; that this defendant purchased from a certain *Moses McNamee* a common warrant, and laid the same upon the said piece of vacant land, sometime in the month of August 1836, and directed the county surveyor to execute the same; that the said surveyor did execute said warrant, and this defendant on or about the 2nd September, 1836, returned the certificate of said survey into the land office, and fully compounded on the same on the said 2nd September, with his own money, and that said tract of land so taken up he called *The Birmingham Mines,* and not *Birmingham Mines,* as the said complainant had named in his said bill of complaint; that the said *Hoye* and *Pettit* had not, nor had either of them or any other person, any concern with this defendant in purchasing said warrant, and that no warrant of any kind was sued out of the land office by this defendant or any other person, for the purpose of enabling this defendant to make said

survey, and that there never was, so far as this defendant knows, any warrant of resurvey sued out in the name of *James H. Smith,* for that or any other purpose; that when this defendant directed the said surveyor to execute the aforesaid common warrant, he told said surveyor to include all the vacant land where it was located, whatever the quantity might be; that this defendant did not at that time, possess any specific knowledge of the location of the said complainant's survey, which he then understood had been recently executed, nor did he know any thing about the survey of said *Hoye* and *Pettit,* further than that he knew the region in which it lay; that this defendant did not then know the location of a single line of said *Steyer's* land, and had not to his knowledge ever seen said *Steyer's* plantation or residence; that the surveyor told this defendant, the land by him taken up in his tract called *the Birmingham Mines,* was vacant, and this defendant then took up, not knowing that in doing so he was to become a party in the controversy between the said complainant and the said *Hoye* and *Pettit,* or that any one laid claim to the land taken up by this defendant. This defendant further answereth and saith, that he made the said survey called *the Birmingham Mines* fairly, and without any fraud towards the said complainant or any other person, and that the said *John Hoye* and *Henry M. Pettit* have not now, nor has either of them now, nor have they or either of them at any time had any share, part, claim or interest with this defendant, in his aforesaid tract of land called *The Birmingham Mines;* that this defendant is advised, there is no law of the State of *Maryland,* and no usage or regulation of the land office of said State, requiring this defendant to give notice to any person that he intended to take up or had taken up said tract of land, further than the notice spread on the record of the surveyor of *Allegany* county, ascertained in the certificate of survey of said tract of land taken up by him, which said certificate of survey of said tract of land was duly recorded on the public books of said surveyor, and the office certificate thereof was duly filed in the land office and compounded on at *Annapolis,* at both of which places the said

complainant, or those claiming under him, or using his name, had counsel, and that the said complainant himself resides in *Allegany* county, and that the said complainant and the world were bound to take notice of the acts of this defendant in relation to said survey called *The Birmingham Mines,* as they appeared, set forth and published on said records. This defendant further answereth and saith, that he practised or endeavored to practise no surprise towards the said complainant in taking up and procuring a title for said tract of land; that as appears by the aforesaid records of the surveyor of *Allegany* county, the said complainant had executed his aforementioned warrant on the 10th day of June, 1836, and by virtue of the same had taken up a quantity of vacant land, and that the said *Hoye* and *Pettit* had executed their warrant on or about the 17th day of May, in the same year, by virtue of which they had also taken up a quantity of vacant land, and that the record of their respective certificates of survey, which said certificates of survey or resurvey, were duly recorded on the surveyor's books of *Allegany* county, was notice to the world of the quantity and location of the land by them respectively selected and taken up; that the piece of land taken up by this defendant was left vacant and unoccupied by the said complainant and the said *Hoye* and *Pettit* at the execution of their aforesaid warrants; that the same was considered by the surveyor of *Allegany* county as vacant land; that this defendant took up and compounded on the same because it was vacant land; that in taking up said tract of land and procuring a title for the same from the State, it was no part of this defendant's design in any way to benefit, favor or befriend the said *Hoye* and *Pettit* in their controversy with the said complainant, or those using his name, and that this defendant did not take up said tract of land called *The Birmingham Mines,* for the purpose of cutting off the connection of any warrant of the said *John Steyer's* with the land taken up by said *Hoye* and *Pettit,* and called *Coal and Iron Certain;* not only so, but so unacquainted was this defendant at that time with the locations of the various tracts and surveys in the

neighborhood now spoken of, that this defendant did not then know, nor does he believe he ever did know, till the plats were made out in the *caveat* cases between the said complainant and this defendant, and between the said complainant and the said *Hoye* and *Pettit;* that the said tract of land called *The Birmingham Mines,* did at all intervene between the pretensions of the said complainant on the one side, and the said *Hoye* and *Pettit's* pretensions on the other side, or cut off the egress of the said complainant with his said warrant, from any locations or survey of his unto the said survey of the said *Hoye* and *Pettit,* called *Coal and Iron Certain,* which said plats in said *caveat* cases were made out in the summer or fall of the year 1837. That the survey or resurvey called *Competition,* the certificate of which is made out in the name of the said complainant, bears date on the 1st November, 1836, but that the warrant under which that resurvey was made, had already been executed on the 10th June, in the same year; that in the interview this defendant took up and compounded on said tract of land called *The Birmingham Mines,* and that the State of *Maryland* granted the same to this defendant by patent, on the 3rd March, 1837, and that as appears by the endorsement on the said certificate of resurvey, called *Competition,* the said complainant or *Dilly* did not pay into the Treasury of the State, the composition money on said land until some time in the month of April 1837, and more than one month after the said tract called *The Birmingham Mines,* had been patented to this defendant; and that this defendant is advised, the said complainant had thus neither legal nor equitable title to the land contained in said tract called *The Birmingham Mines,* when the same was patented to this defendant by the State; that the said tract of land was so patented to this defendant by the State without any objection being made by the said complainant, or any other person whatever, in the form of a *caveat* against this defendant, or otherwise; and that sometime in the summer of the year 1837, this defendant was informed that the said tract of land called *The Birmingham Mines,* had been by the direction of the said

*Dilly* merely platted into and included in the plat and certificate of said tract called *Competition;* and that this defendant then entered a *caveat* against the issuing of a patent to the said *John Steyer* for the said tract of land called *Competition;* that at the hearing of the said *caveat,* the same was by his Honor the Chancellor ruled good against the said complainant. This defendant further answereth and saith, that he is advised that the said survey called *Competition* was not fairly made, nor at a time when it was competent and proper for the said complainant to make the same; that in fact the warrant of resurvey under which the said survey or resurvey called *Competition,* was professedly made, had been already executed on the 10th of June, 1836, and that the said resurvey so made on the 10th day of June, contained according to the certificate thereof, recorded on the surveyor's books of *Allegany* county, the quantity of 577⅝ acres of land in the whole, and not the quantity of 3773⅜ acres; and that the said resurvey so made on the 10th June, 1836, was called *The Plains of Moab Resurveyed;* that the said complainant had no right whatever to execute said warrant of resurvey a *second* time on the 1st˙ day of November, and that the said *second* execution of said warrant ought to be considered void; not only so, but this defendant is further informed and verily believes, that the said warrant was so executed on the 1st day of November, 1836, in the name of the said *John Steyer,* not for the benefit of the said *John Steyer,* but for the use and benefit of a certain *Joseph Dilly,* who is hereinbefore mentioned, and that a certain *George McCulloh* had also some interest in the second execution of said warrant; that a short time after the said complainant had executed his said warrant on the 10th day of June, 1836, the said *Dilly* went to the said *Steyer* and entered into a contract in writing with him, by which for a small sum of money paid to the said *Steyer* the said *Dilly* purchased the privilege of executing said *Steyer's* warrant a *second* time in the name of the said *Steyer,* but in fact for the use of *Dilly* and his *secret* partner or partners in the adventure; that the said contract or instrument of writing contained certain mysterious blanks, which according

to said instrument, were to be filled with reference to a plat at that time said to be in the hands of the county surveyor; that it never has been made to appear that there was at that time any plat in the hands of the said surveyor, relative to the said lands mentioned in said instrument of writing, except the certificate of the resurvey called *The Plains of Moab Resurveyed,* bearing date on the 10th June, 1836, with the usual plat thereto annexed; that this defendant is advised and verily believes, that when said written contract is stript of its mystery, it simply amounts to this, that the said *Steyer* should continue to own the vacancy he had already taken up under his said warrant on the 10th of June as aforesaid; and that the said *Dilly* was authorized to use said *Steyer's* name in executing said warrant a second time; and that after patent should have issued to said *Steyer* for the additional vacancy to be taken up by *Dilly* at the second execution of said *Steyer's* warrant, then said *Steyer* was according to said contract to convey said additional vacancy so taken up to *Dilly;* that doubting the safety of their position under the aforesaid contract, the said *Steyer* was prevailed on to execute a second contract in writing, which it is believed bears date in April 1837, by which the additional vacancy taken up by said *Dilly* as aforesaid, on the 1st day of November, is professedly apportioned between the said *Steyer* and the said *Dilly,* to which said contracts or instruments of writing this defendant refers as being filed among the exhibits in the case of cross *caveats* between said complainant and the said *Hoye* and *Pettit,* and which the said complainant has made a part of his bill of complaint, that such was the device resorted to by the said *Dilly* and the said *McCulloh,* for the purpose of depriving the said *Hoye* and *Pettit* of the benefit of a warrant of resurvey held by them affecting the vacant land intended to be taken up by said *Dilly* and *McCulloh* at the *second* execution of said *Steyer's* warrant, and for the purpose at the same time of appropriating to themselves the said vacant land under color of the *second* execution of said warrant, at a time when the said *Dilly* and *McCulloh* well knew of said *Hoye* and *Pettit's* warrant, and when the said *Dilly*

and *McCulloh* knew that they could not acquire title to the vacant land in question under any new warrant to be by themselves sued out of the land office. This defendant further answereth and saith, that of his own knowledge he knows that the said *McCulloh* is very officious in endeavoring to procure testimony at the hearing of the cross *caveats* already mentioned, that on that occasion this defendant acted as the counsel of said *Hoye* and *Pettit* in taking said depositions; that he then saw in the hand-writing of said *McCulloh,* a paper purporting to be a summary of what the two sons of the said *John Steyer* would swear in the case; that the said *McCulloh* on one or two occasions made his appearance at *Cumberland* with the said young *Steyers,* apparently under his charge, when said testimony was about to be taken; that the said *John Steyer* was not present at the taking of said testimony, but the said *McCulloh* was present while the said young *Steyers* were under examination; that before one of them was put on his examination, the said *McCulloh* had a conference in private with him on the outside of the house; that the said *McCulloh* evinced some anxiety while the said young *Steyers* were under cross examination; that although the said young *Steyers* evidently gave in a labored and premeditated statement of their knowledge in the premises, they fell considerably short of the contents of the aforementioned summary. That after the decision of the aforementioned cases of *caveat* by his Honor the Chancellor, an effort was made in the House of Delegates, during the last session of the Legislature, to obtain a reversal of the decree of his Honor the Chancellor, in the aforementioned cases of *caveat,* or to obtain a result equivalent to a reversal of said decree; that this defendant then appeared at *Annapolis,* before the committee of the House, to whom the said application was referred; that the said *McCulloh* appeared in the committee room at the argument of the case, and as this defendant was informed, and verily believes, used his best endeavours with sundry members of the said House of Delegates, to obtain a decision of the matter favourable to the nominal applicant, *John Steyer;* but that said committee, or all

of them in attendance, unanimously sustained the decree of his Honor the Chancellor, granting a patent to the said *Hoye* and *Pettit*, for said tract of land called *Coal and Iron Certain*, and ruling the *caveat* of this defendant good against the said complainant. And this defendant further answereth and saith, that he is advised that the effort of the said *Dilly*, or of the said *Dilly* and *McCulloh*, hereinbefore stated, to avail themselves of the benefit of said *Steyer's* warrant, by a re-execution of the same, so as to deprive the said *Hoye* and *Pettit* of the use of their aforesaid warrant, and to appropriate to their own use the land included in the said tract called *Coal and Iron Certain*, as well as the land included in said tract called *the Birmingham Mines*, was virtually an attempt to subvert and violate the well established rules of the land office, and the acts of Assembly in such case made and provided, and a device so replete with fraud, as to entitle it to no favor in this Honorable Court. This defendant further answereth and saith, that he is advised, that the intermeddling acts of the said *Dilly* and *McCulloh*, in commencing, and from time to time renewing the present controversy in the name of the said *John Steyer*, but in fact to answer their own purposes, are an offence against the law itself, and will meet with nothing but the merited disapprobation of this Honorable Court. This defendant further answereth and saith, that the only notice he had of said complainant's said warrant, was the conversations that at various times and between various persons, took place in the presence of this defendant, or with this defendant, about the controversy between said *Steyer* and the said *Hoye* and *Pettit*, except so far as the record of the certificate of said complainant's resurvey called *the Plains of Moab resurveyed*, bearing date on the 10th June, 1836, and recorded on the surveyor's books of *Allegany* county, was notice that the said *Steyer* had executed such a warrant, to a copy of which certificate marked A, this defendant refers, as filed in the papers in said cases of cross *caveats*, and exhibited in the complainant's said bill. This defendant further answereth and saith, that he is advised the said complainant was both legally and equitably bound to object to this

defendant's survey called *the Birmingham Mines*, and the issu-
ing of a patent from the State to this defendant for the same,
by *caveat* entered against said survey in the land office, at some
time between the making of said survey and the granting of a
patent to this defendant for the same, or to remain silent for-
ever afterwards; that the assignment of the use of a warrant
of resurvey in the manner attempted to be practised by the
said *John Steyer* and the said *Dilly* and *McCulloh* in the present
case, is totally unprecedented and inadmissible, under the laws
and usages of the land office of *Maryland*; that if any person
has reason to complain of surprise and unfairness in this case
it is this defendant, who does say, that the attempt of the said
*Dilly* and *McCulloh*, to use the said *Steyer's* said warrant of
resurvey, by executing it a second time in his name for their
own benefit, for the purpose of appropriating to their own use
the land already taken up by said *Hoye* and *Pettit*, when it could
not be reached by a new warrant, and the directions given by
the said *Dilly* to the surveyor of the county, as appears by said
surveyor's testimony in the caveat case aforementioned, to use
the field work and notes of the said *Hoye* and *Pettit's* resurvey
called *Coal and Iron Certain;* and the further attempt to appro-
priate to themselves at the same time and by the same means,
the tract of land belonging to this defendant called *The Bir-
mingham Mines*, which latter tract they seem to have included
merely, by the by, is all so full of injustice and so pregnant with
fraud, as to deserve but little tolerence in a court of equity.
This defendant further answereth and saith, that he never did
in any manner practice any deceit or use any unfair means to
secure to the said *Hoye* and *Pettit* a title for their tract of land
called *Coal and Iron Certain*, nor has he this defendant at any
time or in any manner practised any unfair means to procure
from the State, a title for his said tract of land called *The Bir-
mingham Mines;* and that if the said complainant or those
using his name has experienced any surprise, or met with un-
forseen difficulties in the prosecution of the claim set up in the
name of the said plaintiff about said tracts of land, such sur-
prised difficulties ought not to be imputed to this defendant as

any fault of his, and that the patent heretofore granted to this defendant by the State of *Maryland,* for said tract of land called *The Birmingham Mines,* ought not to be vacated as prayed in the complainant's said bill of complaint. And this defendant denies all, and all manner of unlawful combination, confederacy and fraud, wherewith he is by the complainant's said bill of complaint charged, and humbly prays to be hence dismissed, &c.

A commission was issued on the 28th January, 1839, and a variety of proof taken, the results of which, so far as material to the report of this cause, are stated in the opinion of the judge of this court.

By agreement of counsel the following proceedings in the land office were made a part of the record of this cause:

JAMES SMITH *vs.* JOHN STEYER. *In the Land Office,* 21st *November,* 1837. It appears from the proceedings, that *John Steyer,* on the 28th December, 1835, obtained a warrant of resurvey of the tract of land called *The Plains of Moab,* which he caused to be executed as appears by the certificate returned and compounded on for the tract of land called *Competition,* on the 1st November 1836; that *James Smith,* on the 13th of August, 1836, got a certificate of survey for a tract of land called *Birmingham Mines,* upon which he obtained a patent on the 3rd of March, 1837. From the plots returned under the order of survey, it further appears that the tract of land called *Birmingham Mines,* extends entirely across the vacancy over which *John Steyer's* warrant of resurvey has been so extended, from the lines of *The Plains of Moab,* as to reach the greater part of that vacancy of which the tract called *Competition* is mainly composed, to the westward and northward, beyond the lands patented to *James Smith*: whereupon, *Smith,* as the holder of the patent for the tract called *Birmingham Mines,* on the 12th of August, 1837, entered a *caveat* against the issuing of a patent upon *Steyer's* certificate for the tract called *Competition.* It is a general and well established rule of this office, that no patent shall be issued for any land for which a patent has been previously granted, yet it often happens, from inat-

tention or accident that this rule is not observed, and therefore, it has been laid down from a very early period, that a patent always gives title by relation from the date of the certificate, special warrant, or entry in the surveyor's book, in which the land has been particularly designated and described, and for this purpose a warrant of resurvey is considered as a special warrant, binding from its date, so that by this legal relation to the date of the certificate or special designation, the evils which may arise from there being apparently two legal titles derived from the same grantor, for the same land, may be in a great measure easily corrected; where, however, there are yet remaining in the land office two certificates held by different persons for the same land, upon which no patent has been issued, the holder of the elder certificate may by a caveat prevent a patent from issuing upon the younger one. But if he does not do so, and a patent is obtained upon the junior certificate, a patent will not upon a caveat be granted upon such elder certificate, because all the proceedings in the land office being public and open to all persons, it may be fairly presumed that the holder of the elder certificate knew of, and waived all objection to the issuing of a patent upon the junior certificate, because it is the interest of the State to have its vacant land sold, and the titles thereto, without delay, put into complete legal form in the manner prescribed, and also to prevent strife, by refusing to grant several patents to different persons for the same land; and because, he who stands by unmindful of his duty to the public, (for it is held to be the duty of every citizen to keep the State properly informed as to dealings for public property,) and also so grossly neglectful of his own interests, in preventing a rival claim to his property from being let loose against it, ought not to be indulged with the means of disturbing a title which he had thus silently suffered the State to perfect, or be in any way gratified, until he has by a regular course of judicial proceedings, if he can, caused the patent which he alleges has so unjustly shut out his right to be vacated and annulled. This caveat must therefore be sustained, as no patent can be issued to *John* Steyer for any land comprehend-

ed by the patent to *James Smith,* and without including that land or part of it, *Steyer,* although he may come up to, cannot be allowed to take any vacancy found beyond the tract called *Birmingham Mines,* by which all contiguity with it and *The Plains of Moab* has been totally cut off.

Whereupon, it is ordered that the said *caveat* of *James Smith* be and the same is hereby ruled good, and that the said *John Steyer* have leave so to correct his certificate as to take all the vacancy contiguous to *The Plains of Moab,* and up to, but not beyond the tract of land called *Birmingham Mines;* and it is further ordered, that the said *John Steyer,* pay all the costs to be taxed by the Register.

THEODORICK BLAND, *Chancellor.*

*Coal,* surveyed for *John Hoye* the 22nd day of April, 1836, for fifty acres, one undivided half part thereof assigned to *Henry M. Pettit;* certificate returned 2nd May, 1836, and compounded on the same day in the treasury; also on the back of said certificate is the following entry: Caveated by *John Steyer* this 1st December, 1836; caveat entered by the Chancellor's order, to be subject to all objections as to the time of entering the same. Certificate patented to *John Hoye* and *Henry M. Pettit,* 21st November, 1837.

*Coal and Iron Certain,* a resurvey upon the tract called *Coal,* resurveyed for *John Hoye* and *Henry M. Pettit,* the 17th of May, 1836, for 2,756½ acres; certificate returned 2nd September, 1836, and compounded on the same day in the treasury; also on the back of said certificate are the following entries: Caveated by *John Steyer per Thomas S. Alexander,* esquire, his attorney, this 30th November, 1836; August 14th, 1837, Caveated by *James Smith* per his written order. Patented to *John Hoye* and *Henry M. Pettit,* the 22nd November, 1837.

*Competition* resurveyed for *John Steyer* the 1st day of November, 1836, for 3,773¾ acres, a resurvey upon the tracts called *The Plains of Moab* and part of *Sideling Hill;* certificate returned 17th November, 1836, and compounded on in the treasury the 24th April, 1837; also on the back of said certificate are the following entries: December 5th, 1836,

caveated by *John Hoye* and *Henry M. Pettit* per *A. C. Magru-der*, esquire, their attorney; August 12th, 1837, caveated by *James Smith,* per his written order within.

*Register's Statement.* On the 28th day of November, 1836, I made out at the request of *Mr. John Hoye,* who applied to me some days before, a patent on a certificate of survey called *Coal,* lying in *Allegany* county, and containing fifty acres; this certificate was returned to the land office, and compounded on the 2nd day of May, 1836. After making out the patent on the 28th of November, I recorded it, not having any intimation that a caveat was to be entered. I also called at the Chancellor's for his signature to the patent, who was absent from town and his signature could not be obtained. On the 1st of December, 1836, several days after the patent had been made out, recorded and carried to the Chancellor for his signature, a caveat was entered by *Mr. Alexander,* as attorney for *John Steyer.* I have made this statement of the facts at the request of the Chancellor.          GEORGE G. BREWER,
                              *Reg. Land Office, W. S., Md.*

As some censure has been attached to the register for having recorded the patent before he had obtained the signature of the Chancellor, and the great seal of the State to the patent, the Register would beg leave to state, that ever since he has been in the office, both the Chancellor and the Governor have been in the habit of signing blank pieces of parchments for the register, so that if either were absent from the seat of government, a person making application for a patent, might obtain his patent without being detained upon expenses waiting for the arrival of the Governor or Chancellor for his signature. In this case the parchment was signed by the Governor before the patent was made out; the register presumes that he could at the same time have obtained that of the Chancellor, but knowing that the Chancellor was seldom absent from town, and as he has above stated, having no intimation that a caveat was to be entered, thought there could be no impropriety whatever in recording the patent; he knew too, that the Chancellor was at his daughter's, only a few miles from town, and was daily

expected home. The register would further remark, that he has frequently recorded patents before they were sealed and signed by the Chancellor, and he knew it frequently to have been done by his predecessors in office, and no difficulty whatever has ever before occurred. The register hopes to be excused for making this additional statement, as he felt bound to do so in justification of his conduct.

GEORGE G. BREWER,
*Reg. Land Office, W. S., Md.*

JOHN STEYER *vs.* JOHN HOYE. *In the Land Office, 25th May*, 1837. This caveat standing ready for hearing as to the preliminary question, whether it was entered in time or not, and the solicitors of the parties having been fully heard, the proceedings were read and considered. It must be considered as an established rule in the land office, that a caveat may be entered at any time before, but not after a patent has been actually signed by the Governor and the Chancellor, and had the great seal affixed thereto, whereby it must thenceforth be deemed and taken to be the complete and final act and deed of the State; and as deeds for real estate from one citizen to another cannot be recorded until they have been regularly executed and acknowledged, so no patent or grant from the land office can properly be enrolled or recorded, until it has finally had attached to it all, those legally prescribed authenticating solemnities, without which it cannot be regarded as the proper act and deed of the State, and ought not, therefore, to be placed among the public records and archives of the State as such: Whereupon it is ordered, that the said *caveat* having been entered in due time, be and the same is hereby continued to be prosecuted and determined as in other like cases.

THEODORICK BLAND, *Chancellor.*

JOHN STEYER *vs.* HOYE AND PETTIT, AND JAMES SMITH *vs.* THE SAME. *In the Land Office, 21st November*, 1837. Ordered, that the said *caveat* of *John Steyer* be and the same is hereby ruled good, for all the vacancy laying between the tract called *The Plains of Moab* and the tract called *Birmingham Mines*, and that the said *John Steyer* and *Hoye* and *Pettit*

respectively, have leave to correct their several certificates accordingly. And it is further ordered, that *John Steyer* on the one part, and *Hoye* and *Pettit* on the other part, pay all the costs of these *caveats,* to be taxed by the register.

THEODORICK BLAND, *Chancellor.*

HOYE AND PETTIT *vs.* JOHN STEYER. *In the Land Office,* *21st November,* 1837. Ordered, that the said caveat of *Hoye* and *Pettit* be and the same is hereby ruled good for all the vacancy which has been cut off from all contiguity with *The Plains of Moab* by the tract of land called *The Birmingham Mines,* for which a patent has been issued to *James Smith,* and it is overruled for the residue, and that the said *John Steyer* have leave to correct his certificate accordingly. And it is further ordered, that each party pay his own costs.

THEODORICK BLAND, *Chancellor.*

On the 31st October, 1839, the Chancellor (BLAND,) dismissed the bill, being of opinion that no facts or circumstances have been shewn and established, upon which the patents under which the defendants claim, can be in any way invalidated or impeached.

The appeal was argued before BUCHANAN, C. J., STEPHEN, ARCHER, DORSEY, CHAMBERS and SPENCE, Judges.

By McMAHON and ALEXANDER for the appellant, who insisted—

1st. That as the Chancellor, sitting as judge of the land office, had no authority to vacate the patent which had been granted to the appellee *Smith,* his decision in the land office, which assumed the validity of that patent, cannot prevent a determination of the present appeal on its merits.

2nd. That the warrant of resurvey sued out by the appellant was in force on the first day of November eighteen hundred and thirty-six, and was rightly executed on that day. As against the State, therefore, the appellant, having complied with all the rules of the land office, had a right to a patent for all the lands included in his resurvey.

3rd. That the appellees having notice of the rights of the appellant at the dates of their aforesaid warrants, and of the execution thereof, were guilty of fraud in obtaining grants for lands to which the appellant had acquired an equitable title. Hence they are to be treated as trustees for the appellant, and ought to be required to convey those lands to him.

By J. JOHNSON and A. C. MAGRUDER for the appellees, who insisted in support of the decree—

1st. That after the complainant had executed his warrant by the survey of the 10th of June, 1836, and a certificate of that survey had been made out, recorded in the surveyor's office, and delivered to him or his son, he could not open and have it executed a second time, to the injury of parties, who, in the interval, had become *bona fide* purchasers from the State, of the land attempted to be included in the second survey.

2nd. That *a fortiori* this could not be done, at the instance of and for the benefit of a third person, who had acquired, and could acquire, no rights under the said warrant of resurvey by assignment, that species of warrant as such, not being assignable.

3rd. That the second execution of the complainant's warrant, was chiefly, if not exclusively, for the benefit of *Joseph Dilly*, who had actual knowledge, that the land included in such second execution had been taken up by the defendants *Hoye* and *Pettit*, or was liable to be affected by their warrant.

4th. That there is no pretence for the charge of fraud against the defendants, or either of them, and that the complainant and *Dilly*, who is the actual party to this controversy, are much more obnoxious to the charge, in endeavoring to appropriate to themselves the benefit of vacant lands discovered by the defendants, and in availing themselves of work executed by the surveyor at their instance, and for which they paid.

5th. That the rule of the land office, in conformity with which the *caveat* cases were decided, is inflexible, and the

complainant has shown no equitable circumstances to exempt him from its operation.

6th. That *Joseph Dilly* was a necessary party.

SPENCE, J., delivered the opinion of this court.

The material allegation in this bill, namely, that the appellees in this cause obtained their patents by combination and fraud, is unsupported by the proof in the record.

After a careful examination of the progress and history of this cause, we are driven to the conclusion, that all of the grievances and injuries of which the appellant complains, are the unavoidable consequences of his own omissions and neglect. It is not to be questioned that the seniority of his warrant of resurvey gave him a prior right to acquire a title to all the vacancy contiguous to his tract of land called *The Plains of Moab*. But while the law awards preferences and advantages to the favored on the one hand, it exacts care and diligence from them on the other, to the end that full justice may be meted out to all.

The appellant in this case had an interest in virtue of the seniority in his warrant, which, with proper diligence and care, would have placed him beyond the reach of successful controversy, much less defeat; but he slept. The sluggishness of his course is not the only act of self-reproach which the appellant has to endure in this case. His errors and omissions thwart him at every step. To sum up, he made a location of his warrant of resurvey of the tract of land called *The Plains of Moab*, and added 121¼ acres of vacancy, had a certificate of the same recorded by the surveyor, for which he paid the surveyor his fees, and then the appellant *closed his survey*, distinguished in the record as the certificate of the 1' th June, 1836.

*James Smith*, one of the appellees in this case, obtair d a common warrant, caused a survey to be made, and a c rtificate returned to the land office, paid the composition on the same, and after the certificate had lain in the land office the length of time required by its rules and regulations, (vide act

of 1782, chap. 38,) obtained a patent for the tract of land mentioned in these proceedings, by the name of *The Birmingham Mines.*

This tract of land destroyed the continuity between the tract of land first resurveyed for *Steyer,* called *The Plains of Moab,* and the tract subsequently resurveyed for *Hoye* and *Pettit,* called *Coal and Iron Certain.* This survey of *Smith's,* one of the appellees, presents the chief difficulty to the success of the appellant, and unless it be removed, must be conclusive against his right to the land in controversy in this cause, as it is a well established rule, that the vacant land included in a resurvey must be contiguous to the original tract or tracts.

This brings us to the consideration of the integrity of *Smith's* title to the tract of land called *The Birmingham Mines.* And, *first,* we are constained to say, that we do not find any proof in the record, that he procured his grant by fraud or combination, but that he obtained his warrant, caused his survey to be made, the certificate returned, and patent granted in the ordinary and usual mode.

It was urged in the argument with great ingenuity and force, that *Steyer's* warrant of resurvey being *first* in point of date, gave him *an interest* in the land in dispute, paramount to all others of subsequent date, and this is not denied; but suppose after his warrant issued, he had *not* caused a resurvey to be made, and certificate to be returned to the land office, within the time required by law, his interest would have been lost by his own supineness and neglect. So likewise, if after *Smith* had returned his certificate for the tract of land called *Birmingham Mines,* *Steyer* had not neglected for six months, (the time prescribed by the act of 1782, chap. 38, for certificates to lie before patent issues, and for the purpose of a *caveat,*) to enter his *caveat* to *Smith's* certificate, the judge of the land office would unquestionably have rejected *Smith's* certificate, and thereby his equitable interest would have remained unimpaired.

If it be insisted that *Smith* was concluded from making his survey, by *Steyer's* oustanding warrant of resurvey, the answer

is found in the proof, that his warrant was executed, and certificate recorded by the surveyor, and that from the plot, (called in the proceedings *Steyer's* rough plot,) he, *Steyer*, not only had not, but could not locate in his resurvey the land included in *Smith's* survey, by reason of the *interlocking* of the lines of older tracts, which destroyed the continuity of the vacancy.

The knowledge conveyed by this plot, is the only evidence in the record that *Smith* knew of *Steyer's* warrant, and from this he could draw no other conclusion, than that the land included in his survey called *The Birmingham Mines*, was untouched by *Steyer's* resurvey, theretofore executed, called *The Plains of Moab*.   The decree is affirmed.

DECREE AFFIRMED.